# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs June 26, 2013

## STATE OF TENNESSEE v. JEROME R. FLANIGAN

**Appeal from the Criminal Court for Hawkins County**
**No. 10-CR-0478     John F. Dugger, Jr.,  Judge**

---

### No. E2012-01852-CCA-R3-CD-JULY 31, 2013

---

A Hawkins County jury convicted the Defendant of aggravated sexual battery, and the trial court sentenced him to twelve years in the Tennessee Department of Correction.  On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his conviction; (2) the trial court erred when it denied him the opportunity to discover past allegations and cross-examine the victim about them; (3) the trial court erred when it denied his request to access the victim's mother's diary regarding the events; and (4) the trial court erred when it sentenced him.  After a thorough review of the record and applicable authorities, we affirm the trial court's judgment.

#### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROGER A. PAGE, JJ., joined.

John S. Anderson, Rogersville, Tennessee, for the appellant, Jerome R. Flanigan.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; C. Berkeley Bell, District Attorney General; and Alex Pearson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts
### A.  Motion Hearing

This case arises from an allegation that the Defendant sexually abused his girlfriend's daughter.  In response to this allegation, a Hawkins County grand jury indicted the Defendant on one count of rape of a child.

Before the Defendant's trial, he filed a motion for the production of records. In it, he asked the trial court to compel the Tennessee Department of Children's Services ("DCS") to release records from a previous complaint of sexual abuse made by the victim. The Defendant also filed a motion for exculpatory evidence. In it, he asked the trial court to compel the victim's mother to release to him a book or diary that was in her possession and that contained notes and facts about the sexual abuse alleged by the victim.

The trial court held a hearing on these two motions. At the hearing, the parties presented the following evidence: The Defendant's attorney informed the trial court that he spoke with a representative of DCS who informed him that the victim had made previous allegations against another individual when she was approximately four years old. In the nine years that had passed since those older allegations, the investigative file on that case had been purged. The trial court indicated that the DCS file would only be relevant if the State was alleging that the Defendant in this case injured the victim in some way, such as an injury to her hymen, and the records showed that the victim had previously been injured in that manner. The State informed the trial court that it had no such intention. The trial court denied the Defendant's request for production of the records.

The trial court then addressed the Defendant's motion for exculpatory evidence, namely the diary that the victim's mother had kept. The State informed the trial court that the diary was not in the State's possession. The State said that this was not a "formal diary" and that the State had no indication that there was any exculpatory evidence in the book. The State concluded that it could not produce something for the Defendant that was not in its custody or control. The Defendant's attorney asserted that he did not know what was in the book. The trial court denied the Defendant's motion.

## B. Trial

At the Defendant's trial, the parties presented the following evidence: The victim, C.R.,[1] testified that, in April and May of 2010, she was eleven years old and living in an apartment with her mother, the Defendant, who was her mother's boyfriend, her brothers, her grandmother, and her aunt. The victim recalled an occasion where the Defendant asked her to go with him to the storage room to get some make-up. She agreed and went with him. The victim said that, while they were in the storage room, the Defendant put his hands "down [her] pants" and put his finger into her vagina. The victim said that she did not want this to happen. She recalled that her mother came through the doorway of the storage room, and the Defendant stopped. The victim recalled that the Defendant told her that if she told anyone

---

[1]To protect her privacy, the victim will be referred to by her initials only or as "the victim."

that he could go to jail for a long time. The victim testified that, later, she was playing with a toy piano, and the Defendant asked her if she wanted to help him put the piano in the storage room.

The victim said that, a few days later, on Sunday May 2, 2010, she went to church with her friend and then the two went "mud bogging." When she returned home, she did not feel well. Her mother took her to the bathroom to help her change, and the victim told her mother what the Defendant had done.

The victim said her mother was "mad and sad" by what she had told her. She said that her mother exited the bathroom and went to confront the Defendant, asking him if he had touched the victim inappropriately. The victim said the Defendant admitted that he had. The victim said that, shortly thereafter, her mother packed up their family and moved them to a cousin's house.

During cross-examination, the victim testified that the State's attorney had helped her practice testifying. She said that she had not discussed her testimony with her mother but had only gone over it with the State's attorney. The victim explained that the Defendant had asked her if the make-up in the storage area belonged to her or her friend and asked her to come and look at it. The victim was uncertain how long the two were in the storage area. She recalled that she stayed in the storage room with the Defendant after her mother came in and left. She said that the Defendant was blocking the walkway, so she did not think she could leave. The victim denied that she had said that the Defendant put two fingers inside of her and maintained that he only placed one finger inside of her.

The victim's mother, S.H.,[2] testified that the Defendant was her boyfriend at the time of these alleged events, the end of April and early May 2010. She said that, around that time, she was living in an apartment with the Defendant, her three children, her mother, Shirley Skelton, and her aunt. S.H. testified that on May 2, 2010, the victim went "bogging" and then to church. When the victim arrived back home, she was not feeling well and was running a high temperature. The victim lay down on the couch and then got up to go to the bathroom. While she was in the bathroom, she yelled for S.H. S.H. went to the bathroom, and the victim told her that she needed to talk to her and closed the bathroom door behind S.H. The victim appeared pale and "looked really upset."

S.H. said that the victim told her about the incident with the Defendant, and S.H. felt as if the oxygen had been sucked out of her. When she regained her composure, she exited the bathroom with the victim to confront the Defendant. S.H. asked the Defendant what he

---

[2]To protect the victim's privacy, we will refer to the victim's mother by her initials only.

had done, and the Defendant admitted that he had "stuck his hand in [the victim's] pants and he put his finger in her." S.H. said that, after the Defendant's admission, there was a lot of yelling. S.H.'s mother, Skelton, walked into the room and inquired about the argument, and the Defendant told Skelton that she was going to hate him. The Defendant told S.H. that he was sorry for what he had done. S.H. testified that the victim's account and the Defendant's admission reminded her that, a few days before this incident, she recalled seeing the Defendant and the victim in the storage area adjacent to their apartment.

The Defendant then again admitted to his actions and told S.H. that she had a promiscuous eleven-year-old daughter. The Defendant told S.H. that she needed to take away the victim's makeup and not let her wear the clothing that she wore. After the argument, the Defendant left the apartment with his sister. Shortly thereafter, S.H. moved her family to a relative's home located in a different county.

S.H. testified that she reported this incident to the police department, and Officer Mullins was assigned to the case. As part of the police investigation, S.H. took the victim to a gynecologist.

During cross-examination, S.H. testified that she did not make the police report until almost three days after the victim's disclosure. S.H. explained the delay was based, in part, upon the fact that the victim was sick and running a 103 degree temperature. She said she did not take the victim to the doctor until she was told to do so, in an attempt to follow the officer's instruction. S.H. agreed she had not found any blood on the victim's panties while doing the laundry.

Skelton, the victim's grandmother, testified that, on May 2, 2010, she was in her bedroom taking a nap when she heard some "commotion" in the other room between S.H. and the Defendant. Skelton said she went into the other room, and S.H. told her that the Defendant had "hurt" the victim. Skelton said the Defendant told Skelton, "you're going to hate me." She asked what he meant, and he told her that he had "stuck his hands down [the victim's] pants and he fingered her." The Defendant told her that this happened while the two were in the storage area together. Skelton recalled that S.H. told the Defendant he was going to jail, and the Defendant said that he would "run." He then left the apartment with his sister. Skelton said that she and S.H. packed up what they needed from the apartment, and left. Skelton said that, later that evening, the victim came to her crying. Skelton said she was crying too, and the victim told her that the Defendant had hurt her.

During cross-examination, Skelton testified that she was present when the victim was practicing her testimony. She conceded that her statement to police included that, when the victim came to her, she said the Defendant had "touched" her not that he had "hurt" her.

Skelton also said that she told police in her statement that the victim said the Defendant put two fingers inside of her and not one.

Dr. Shawn White, an obstetrician and gynecologist in Kingsport, Tennessee, testified that he examined the victim for an alleged sexual assault. The victim told Dr. White that her mother's boyfriend had digitally penetrated her. Dr. White testified that he examined the victim approximately one month after the alleged assault and saw no signs of trauma. The victim's hymeneal ring was intact, which was expected considering the type of penetration the victim alleged.

Officer Will Mullins, with the Kingsport Police Department, testified that he investigated this case. As part of his investigation, he met with Skelton and S.H., and determined what the victim had said had happened. Officer Mullins attempted to locate the Defendant at the Defendant's apartment. The Defendant was not there, but his son arrived shortly after the officer. Officer Mullins told the Defendant's son that he and other officers were looking for the Defendant. Officer Mullins said that other officers located the Defendant near a river at around 11:00 p.m. and started talking to him. The Defendant jumped into the river. Officer Mullins said he and other officers attempted to get the Defendant to come back to the bank of the river, and the Defendant refused. Officer Mullins testified that the officers were unable to apprehend the Defendant at that time, but U.S. Marshalls later apprehended the Defendant in a different county.

Officer Kevin Grigsby, with the Church Hill Police Department, testified that he participated in the attempt to locate the Defendant. He said that he and other officers received information that the Defendant was "staying" in an area near "the river." The officers walked the bank from the North in a Southernly direction and saw a campfire burning and heard loud music playing. Officer Grigsby, who said he was familiar with the Defendant, saw that the Defendant at the campsite. The officers approached the Defendant and asked him to show his hands. Officer Grigsby said that, as he approached the campsite, he saw the Defendant jump "head first" into the river. He ordered the Defendant several times to come back to the bank but instead the Defendant swam toward the middle of the river. The Defendant got into the river current and proceeded West. The officers attempted to follow the Defendant, but they lost sight of him and were unable to locate him that night.

Officer Grigsby testified that he enlisted the aid of the United States Marshall's Service to help locate the Defendant. U.S. Marshalls apprehended the Defendant in another county on August 24, 2010.

The Defendant offered the testimony of Donna Thomas, his sister, who testified that the Defendant called her on May 2, 2010, to come to his apartment and get him. Thomas testified that, when she arrived, she was confronted by S.H. who was "throwing things and screaming" at the Defendant. S.H. was screaming that the Defendant had touched the victim. Thomas said she never heard the Defendant make any admission to this allegation. Thomas waited for the Defendant to get an overnight bag, and then the two left.

During cross-examination, Thomas conceded that she was not there for the entirety of the conversation, and she did not hear if the Defendant admitted touching the victim earlier in the conversation.

Jennifer Seay, the victim's aunt and S.H.'s ex-sister-in-law, testified that she had three young children. She had allowed the Defendant to be around her children and had seen nothing out of the ordinary. Seay said she had been around S.H. and the victim when they were with the Defendant, and she never saw anything out of the ordinary during those times. Seay further said that she had no reservations about leaving her children with the Defendant.

During cross-examination, Seay testified that she was not present on May 2, 2010, and she did not know what occurred at that time. She said that she knew the Defendant well. She said, however, she was aware the Defendant "had some priors" but did not know specifically that he had been previously convicted of reckless aggravated assault and fourth offense felony DUI.

The Defendant testified that S.H. was his fiancé, and the two intended to get married within a few months of May 2010. S.H. had three children with whom the couple lived, and also living in the apartment were S.H.'s mother and aunt. The Defendant recalled that there was a storage room next to the apartment, and he estimated its size at around twenty-six feet by forty feet. In the storage room, the couple kept old furniture, clothes, and equipment from a business the Defendant previously owned. A few days before May 2, 2010, the Defendant was sorting through this equipment, in anticipation of opening another business, when C.R. came home from school with her brothers and "settled into the apartment." The Defendant recalled that the weather was nice, so the three children were going in and out of the apartment to play.

The Defendant testified that C.R. came into the storage room. He told her that he had been looking through boxes from a previous move and had found some clothing and some makeup. He showed her where he had placed it on a bench. The Defendant said that the two "commenced wrestling around and playing," which was not unusual for them. They often played in this manner in front of Skelton and S.H. The Defendant then described what happened saying:

-6-

I don't know exactly how to explain it all. We went to elbowing it or she went to elbowing at me, and I reached across her shoulders because she was backwards to me. When I did, she grabbed my hands to pull me over, kind of like she was going to act like she was going to throw me over her shoulder but, instead, she pulled my hands down to her legs. I figured that she would lock her legs onto my hands and elbow me is typical for her and her brothers to do.

. . . .

Just a wrestling move that they had learned; it's just playful. . . . [W]hen I realized what was happening, she had pulled my hand up under a skorts (phonetic), loose leg skorts. At that point in time I knew that she had done been touched, that I had touched her at that point, and I couldn't deny that I had touched her.

The Defendant went on to explain that he did not intend for this to happen and that he did not touch her again. The Defendant said he never put his finger inside of C.R. and that he never touched her intentionally. He said he did not tell S.H. about the incident because he was "scared that it would be turned around" on him.

The Defendant described S.H.'s confronting him about the situation. She approached him, while mad, and accused him of touching the victim. The Defendant tried to explain that it was accidental, but S.H. and Skelton were screaming and yelling. The Defendant said that the more he tried to explain, the more angry S.H. and Skelton became, so he called his sister to come and get him. The Defendant said that S.H. agreed that there was more to the story than what the victim had claimed, and she agreed not to involve law enforcement if the Defendant did not attempt to contact them. S.H. told the Defendant that their relationship was over. Shortly thereafter, the Defendant left with his sister.

The Defendant testified that, when he jumped into the river as testified to by law enforcement, he had been "drinking pretty heavily." He said that he knew he had a probation violation warrant for his arrest and that the police came in "like a herd of elephants." He said he got "spooked" and ran because he knew he was going to be arrested on violation of probation. He later made arrangements to turn himself in. He was, however, arrested before he could turn himself in to police custody.

During cross-examination, the Defendant testified that he "absolutely" did touch the victim's vagina. He agreed that he never told anyone about the touching, and that he and

S.H. later argued about this touching. The Defendant agreed he had previously been convicted of reckless aggravated assault and of fourth offense felony DUI.

During redirect examination, the Defendant testified that he pled guilty to both of his prior offenses because he was, in fact, guilty. He denied that he was guilty of the charge in this case.

Based upon this evidence, the jury convicted the Defendant of the lesser-included offense of aggravated sexual battery.

### C. Sentencing Hearing

At the Defendant's sentencing hearing, the State asked the trial court to apply several enhancement factors, and the Defendant argued against those enhancement factors. The trial court then found:

> [Defendant], the jury has found you guilty of aggravated sexual battery. It carries eight to twelve years at a hundred percent. It's my duty to sentence you.
>
> Under mitigating factors under 40-35-113, I look at those. Your lawyer thinks that offense was committed under unusual circumstances, that it was unlikely that it was a sustained attempt to violate the law to motivate the conduct. I can't find that that applies.
>
> I look at all these mitigating factors and I don't find that any apply.
>
> Enhancement factors, I think number one applies or that the [D]efendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range.
>
> Your record is pretty awful.
>
> . . . .
>
> I don't know what's been going on with you in your life, why you can't get on the right track. But back in '94, you had a marijuana offense, felony marijuana offense, over a half ounce, you got a year sentence felony there.

June 24th, '94, a theft under five hundred dollars, eleven months, twenty-nine days there.

You had an assault conviction on June 24th, '94.

May 18th, '94, driving under the influence and drug paraphernalia, going armed.

June 2nd, '94, failed to appear.

You had some bad checks in there you were summoned on.

No driver's license in '99.

Another D.U.I. second, a D.U.I. second and possession of a prohibited weapon.  July 20th '99.

Simple possession of marijuana, failed to appear in Court, June 21st, '99.

Had a domestic violence charge where it was dismissed while you attended domestic violence classes.

D.U.I. fourth offense, leaving the scene of the accident, reckless aggravated assault in Sullivan County, August 1, 2007, two year sentence.

Domestic violence on March 26, 2007, review that in three months with the Court, Sessions Court, here in Hawkins County.

Probation revoked, 6-24-08.

You were on some kind of parole status when this offense occurred because the Board of Probation and Paroles . . . had a violation of parole on you on May 5, 2010.

It was served on November 29, 2010, your parole was revoked . . . . You've got a heck of a record here.

So I certainly find that you have a previous history of criminal convictions and criminal behavior in addition to those necessary to establish the appropriate range.

You're still a Range 1 offender, though, because these prior felonies, you don't have two within two classes. You have one within two classes of a B. You have a D felony reckless aggravated assault, but the others are E felonies and they will not move you into a Range 2.

The Court finds that this offense occurred while you were on parole, which is an enhancement factor. You were on parole, and even testified that there was a parole warrant you thought and that's why you jumped in the river and swam out in the river and floated down the river until you couldn't be found.

And the Court finds that you did violate a position of private trust. You were the fiancé[], you were an adult, you lived in the house, you were supposed to be there, and the trust was put into you by [C.R.'s] mother that by being a fiancé[] and living in the residence you were in a position of private trust placed in you to protect this child, and you ended up admittingly [sic] touching her vagina. You admitted that you did that. The jury didn't believe your story, but you at least admitted to doing it.

But I find that there's three enhancement factors and no mitigating factors. I'm giving great weight to your three prior felony convictions in this, and I think the only sentence is twelve years. So you[r] sentence will be twelve years, on hundred percent release eligibility . . . .

It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his conviction; (2) the trial court erred when it denied him the opportunity to discover past allegations and cross-examine the victim about them; (3) the trial court erred when it denied his request to access the victim's mother's diary regarding the events; and (4) the trial court erred when it sentenced him.

### A. Sufficiency of the Evidence

The Defendant contends that the evidence against him is insufficient to sustain his conviction because there was no evidence that the Defendant's touching of the victim was for the purpose of sexual arousal or gratification. The State counters that it presented sufficient evidence that the jury could infer that the Defendant's touching of the victim was for sexual arousal or gratification. The State notes it offered proof that the Defendant waited until the two were alone and that the Defendant told the victim he would go to jail for a long time if she told what he had done. This, the State asserts, supports the sexual arousal or gratification element of aggravated sexual battery.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

In this case, the Defendant was charged with one count of rape of a child. The jury convicted him of the lesser-included offense of aggravated sexual battery. When reviewing a sufficiency claim, this Court must review the evidence to support the crime for which the defendant was convicted and not the crime for which he was charged. *State v. Parker*, 350 S.W.3d 883, 907 (Tenn. 2011). To sustain a conviction of a lesser-included offense, the proof must be sufficient to support every element of the offense for which the Defendant was convicted. *Id.* at 909.

Tennessee Code Annotated section 39-13-504 (2010) defines aggravated sexual battery. It states, "Aggravated sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances: . . . (4) The victim is less than thirteen (13) years of age." "Sexual contact" includes the intentional touching of the victim's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification. T.C.A. § 39-13-501(6) (2010).

"Sexual contact" includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can reasonably be construed as being for the purpose of sexual arousal or gratification.

T.C.A. § 39-13-501(6) (2010) (emphasis added). "Intimate parts" includes the primary genital area, groin, inner thigh, buttock or breast of a human being. T.C.A. § 39-13-501(2) (2010).

The phrase "for purposes of sexual arousal or gratification" simply defines the nature and purpose of the "sexual contact." *State v. Mahlon Johnson*, No. W2011-01786-CCA-R3-CD, 2013 WL 501779, at *9 (Tenn. Crim. App., at Jackson, Feb. 7, 2013), *no Tenn. R. App. P. 11 application filed.* The requirement of a particular purpose, to arouse or gratify sexual desire, distinguishes the crime of sexual battery from an ordinary assault and from non-criminal touching or contact. *See State v. Anthony Lee Hill*, No. E2003-02998-CCA-R3-CD, 2005 WL 623244, at *5 (Tenn. Crim. App., at Knoxville, Mar. 17, 2005) (citing MODEL PENAL CODE § 213.4 (1980)), *Tenn. R. App. P. 11 application denied* (Tenn. Oct. 10, 2005).

This Court has previously examined the statute defining "sexual contact" and concluded "there is no requirement that the sexual contact itself be for sexual arousal or gratification." *State v. Roy Chisenhall*, No. M2003-00956-CCA-R3-CD, 2004 WL 12177118, at *3 (Tenn. Crim. App., at Nashville, June 3, 2004), *no Tenn. R. App. P. 11 application filed*. The Court went on to state that the statute also does not require that the appellant become sexually aroused or gratified by the sexual contact. *Id.* The statute merely requires touching that can be "reasonably construed as being for the purpose of sexual arousal or gratification." *Id.* (citing T.C.A. § 39-13-501(6) (2010)); *State v. Steven Webster*, No. W1999-00293-CCA-R3-CD, 1999 WL 1097820, at *1-2 (Tenn. Crim. App., at Jackson, Nov. 22, 1999), *perm. app. denied* (Tenn. 2000)).

We conclude that the evidence, viewed in the light most favorable to the State, is sufficient for the jury to reasonably construe that the Defendant's touching of the victim was for sexual arousal or gratification. The Defendant brought the victim into the storage room under the guise of asking her to see if items located therein belonged to her. He then put his hands down her pants and inserted his finger into her vagina. The Defendant told the victim that he could go to jail for a long time if she told anyone what he had done. The victim told her mother, who confronted the Defendant. The Defendant admitted his actions, and he told the victim's grandmother, Skelton, that she was going to hate him for what he had done. The Defendant told the victim's mother that she should prohibit the victim from wearing so much make-up and such provocative clothing. The Defendant called the victim "promiscuous" during an argument with S.H. about the incident. This evidence supports the jury's finding that the Defendant's touching of the victim was sexual in nature and constituted "sexual contact" as defined by the aggravated sexual battery statute. The Defendant is not entitled to relief on this issue.

## B. Past Allegations of Sexual Abuse

-13-

The Defendant contends the trial court erred when it denied him the opportunity to discover and cross-examine the victim about past allegations of sexual abuse, which the Defendant asserts were "determined to be unfounded and false." The Defendant asserts the victim had made similar allegations against another family member previously, which were reported, but that the trial court improperly refused to allow him to examine the records of this report. The State asserts that the trial court properly denied the Defendant's motion to compel DCS to produce its records about the previous complaint because the records no longer existed. The parties agreed at the motion hearing that the records had been "purged" and no longer existed. Therefore, the State asserts, because the records did not exist, the trial court properly denied the Defendant's motion.

Tennessee Rule of Criminal Procedure 16 governs the disclosure of evidence by the State. That rule states that the following information is subject to disclosure:

> (F) Documents and Objects. Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings, or places, or copies or portions thereof, if the item is within the state's possession, custody, or control and:
>
> (i) the item is material to preparing the defense;
>
> (ii) the government intends to use the item in its case-in-chief at trial; or
>
> (iii) the item was obtained from or belongs to the defendant.

(G) Reports of Examinations and Tests. Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph the results or reports of physical or mental examinations, and of scientific tests or experiments if:

> (i) the item is within the state's possession, custody, or control;
>
> (ii) the district attorney general knows--or through due diligence could know--that the item exists; and
>
> (iii) the item is material to preparing the defense or the state intends to use the item in its case-in-chief at trial.

-14-

A trial court has wide discretion to fashion an appropriate remedy based upon the circumstances of each case and the sanction must fit the circumstances of that case. *See State v. Anthony D. Forester*, No. M2002-0008-CCA-R3-CD, 2011 WL 1431980, at *9 (Tenn. Crim. App., at Nashville, Apr. 12, 2011) (citing *State v. Leon Goins*, No. W1999-01681-CCA-R3-CD, 1999 WL 1531111, at *2 (Tenn. Crim. App., at Jackson, Dec. 27, 1999), *perm. app. denied* (Tenn. July 17, 2000)), *perm. app. denied* (Aug. 24, 2011). Whether a defendant has been prejudiced by the State's failure to disclose information is a significant factor in determining an appropriate remedy. *State v. Smith*, 926 S.W.2d 267, 270 (Tenn. Crim. App. 1995). The defendant bears the burden of showing "the degree to which the impediments to discovery hindered trial preparation and defense at trial." *State v. Brown*, 836 S.W.2d 557, 560 (Tenn. 1993).

We assume that the Defendant sought any reports of physical or mental examinations of the victim, as well as any other documents that would be contained in any DCS files concerning the victim and her past allegations of sexual abuse. The discovery rule clearly requires that the report be in the state's possession, custody, or control. In this case, the State did not have possession, custody, or control over this evidence because the evidence was destroyed years earlier by DCS. There is no allegation that the report was destroyed in anything other than a routine purge of files by DCS. Accordingly, we conclude that the trial court did not err when it denied the Defendant's request for this report. The Defendant is not entitled to relief on this issue.

## C. Victim's Mother's Book

The Defendant contends that the trial court erred when it denied his request to access the victim's mother's diary, which he terms a "scrapbook" in his brief, regarding these events. He also asserts that the trial court erred in not allowing him to impeach the victim's mother about the book and any allegations it may contain about her own prior sexual abuse. The Defendant said he wanted to be permitted to inspect the book to see "if there were similarities between the scrapbook and the victim[']s allegations." The Defendant asserts that the book, taken with the fact that the victim had made a prior false allegation of sexual abuse, was important to impeach the victim's testimony.

The State counters that the "scrapbook" or diary of the victim's mother, which allegedly contained S.H.'s writings about sexual abuse that she suffered at the hands of her stepfather, was not in its custody or control. Further, the State contends the Defendant has offered no evidence that the diary contained exculpatory material, and, as the trial court noted, the Defendant's request was a "fishing" expedition.

-15-

As previously stated, the relevant rules regarding discovery require that the documents be in the State's possession, custody, or control. In the case under submission, we agree that the book was not properly subject to disclosure pursuant to Tennessee Rule of Criminal Procedure 16 as it was not in the custody or control of the State, as required by the rule. Further, there is no evidence that the book was material to preparing the defense, the book was not used by the State in its case-in-chief, and the item did not belong to the Defendant. *See* Tenn. R. Crim. P. 16(F)(i)-(iii). Accordingly, the book was not subject to discovery even though the Defendant requested that the State disclose it. Further, the trial court determined that if "something that happened to the victim's mother, some alleged incident with her before, would not be relevant in this case." Accordingly, the trial court did not err when it declined to allow the Defendant to cross-examine S.H. about the book. The Defendant is not entitled to relief on this issue.

## D. Sentencing

The Defendant contends the trial court erred when it sentenced him because it relied upon his prior criminal history, which contained primarily misdemeanors, and not prior convictions involving sexual conduct. The State first contends that the Defendant has waived this issue for failing to cite to the record or to cite to any authority. Further, the State contends that the trial court properly sentenced the Defendant to a within-range sentence.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2), (d) (2010); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). In 2005, the Tennessee General Assembly amended the sentencing law in order to bring Tennessee's sentencing scheme into compliance with United States Supreme Court rulings on the subject. *See United States v. Booker*, 543 U.S. 220 (2005); *Blakely v. Washington*, 542 U.S. 296 (2004).

Before the 2005 amendments to the Sentencing Act, both the State and a defendant could appeal the manner in which a trial court weighed enhancement and mitigating factors applied to the defendant's sentence. T.C.A. § 40-35-401(b)(2) (2004). The 2005 amendments, however, deleted, as grounds for appeal, a claim that the trial court did not properly weigh the enhancement and mitigating factors. *See* 2005 Tenn. Pub. Acts ch. 353, §§ 8, 9. As a result, the appellate courts were "left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." *Carter*, 254 S.W.3d at 345-46.

Appellate review of sentences has been de novo with a presumption of correctness. *See* T.C.A. § 40-35-401(d) (2010). In a recent decision, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *Id.* at 708; *State v. Caudle*, 338 S.W.3d 273, 278-79 (Tenn. 2012) (explicitly applying the same standard to questions related to probation or any other alternative sentence).

A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980).

The "presumption of reasonableness" applied to sentences imposed by trial courts "'reflects the fact that, by the time an appeals court is considering a within-Guidelines sentence on review, both the sentencing judge and the Sentencing Commission will have reached the same conclusion as to the proper sentence in the particular case.'" *Bise*, 380 S.W.3d at 703 (quoting *Rita v. United States*, 551 U.S. 338, 341 (2007)). A presumption of reasonableness "simply recognizes the real-world circumstance that when the judge's discretionary decision accords with the [Sentencing] Commission's view of the appropriate application of [sentencing purposes] in the mine run of cases, it is probable that the sentence is reasonable." *Rita*, 551 U.S. at 350-51.

In conducting its review, this Court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. *See* T.C.A. §§ 40-35-102, -103, -210 (2010); *see also Bise*, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. *See* T.C.A. § 40-35-401, *Sentencing Comm'n Cmts*.

In the case under submission, the State correctly notes that the Defendant has failed to cite to the record or any authority to support his argument on appeal. He, therefore, risks waiver. Tenn. R. App. P. 10(b). The Defendant's issue also, however, lacks merit. The trial court found that there were three applicable enhancement factors: (1) that the Defendant had a history of previous criminal convictions in addition to those necessary to establish his range; (2) that the Defendant was on parole at the time that he committed the offense; and (3) that the Defendant abused a position of private trust. *See* T.C.A. § 40-35-114 (1), (13), (14). Each of these enhancement factors was supported by the evidence. The Defendant's prior record includes three felony convictions and numerous misdemeanor convictions. The fact that his record does not include any sexual offenses does not render the trial court's application of this enhancement factor improper. Further, the trial court properly considered two other enhancement factors, both of which are also supported by the evidence. We conclude that the Defendant's sentence of twelve years was imposed in a manner consistent with the purposes set out in the 1989 Act. We are, therefore, bound by its decision as to the length of the sentence. The Defendant is not entitled to relief on this issue.

### III. Conclusion

Based on the above mentioned reasoning and authorities, we conclude the evidence is sufficient to support the Defendant's conviction, that the trial court did not make evidentiary errors, and that the trial court properly sentenced the Defendant. The judgment of the trial court is affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE